STEPHEN C. RYAN, ID # 4255
**STEPHEN C. RYAN, P.C.**
42014 N. Venture Dr., C-114
Anthem, Arizona  85086
steveryan@azis.com
(623) 551-3813
*Attorney for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JOHN PEARSON and STEPHANIE LEE, husband and wife,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>WRIGHT MEDICAL TECHNOLOGY, INC., a foreign corporation,<br><br>　　　　　Defendant. | CV 09-485-PHX-FJM<br><br>PLAINTIFFS' RESPONSIVE MEMORANDUM TO DEFENDANT WRIGHT MEDICAL TECHNOLOGY, INC.'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE |

Plaintiffs Pearson, by and through counsel undersigned, hereby submit their response to Defendant Wright Medical's Motion for Summary Judgment and Motion to Strike.  The Motion must be denied for the reasons set forth in the attached Memorandum.

DATED this 30th day of April, 2010.

　　　　　　　　　　　　　　　　STEPHEN C. RYAN, P.C.


　　　　　　　　　　　　　　　　By /s/ <u>Stephen C. Ryan</u>
　　　　　　　　　　　　　　　　42104 N. Venture Ct., C-114
　　　　　　　　　　　　　　　　Anthem, Arizona 85086
　　　　　　　　　　　　　　　　*Attorney for Plaintiffs*

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Defendant's motion is predicated on one fact – that Dr. Hendrickson formed his opinions without being aware that the prosthesis in question was a modular prosthesis

versus a one-piece prosthesis. The difference in the two types of prosthesis is that the "neck" of the prosthesis which fractured is designed to be removed from the femoral stem in a modular prosthesis whereas the neck and stem are a one-piece configuration in the traditional prosthesis.

It is certainly true that Defendant's counsel scored some points at Dr. Hendrickson's deposition based upon his misunderstanding in that regard. But Defendant then wants to take that misunderstanding and extrapolate it into a legal victory as a matter of law. As the undisputed facts indicate, however, Dr. Hendrickson's opinions as to the cause of the fatigue fracture were, and still remain, opinions which are independent of and unrelated to the structural component "style" of the prosthesis. Simply put, Dr. Hendrickson has opined that the prosthesis fractured due to a manufacturing defect and that this defect existed, and caused the fracture to occur, irrespective of whether the prosthesis was of a modular or one-piece design.

As Dr. Hendrickson's current affidavit indicates, and as his prior reports, affidavits and deposition transcript indicate, he bases his opinion on the cause of the fracture on scientific and metallurgical principles separate and apart from the Defendant's claim of fretting. While it is true that Dr. Hendrickson did not consider the possibility of fretting as a cause of the fatigue fracture because he did not initially believe there was any metal to metal contact near the area of the fracture, his opinions were based upon his macroscopic and microscopic examination of the area of the fracture.

As his deposition testimony cited in Plaintiffs' Supplemental Statement of Facts clearly indicates, he provided defense counsel with at least three separate and distinct reasons why fretting was not and could not be the cause of the failure. More importantly, he did so **before** he learned that the design was modular and that there could have been metal to metal contact near the area of the fracture. In other words,

Dr. Hendrickson didn't "back pedal" at all – he had already provided Defendant's counsel with multiple reasons why fretting could not have been the cause of the fatigue fracture **before** he knew that his belief as to the component structure of the prosthesis was in error. Simply put, his opinions eliminated any factual support or basis as to Defendant's fretting defense before he even knew that fretting was a possibility.

The experts on both sides of this litigation agree that there was a fatigue fracture that occurred. Defendant has hired an expert who claims fretting is the cause of the fatigue fracture. Plaintiff's expert opines that the cause of the fatigue fracture was a manufacturing defect which he described in detail in his report, affidavit and deposition. Present before the Court is nothing but the usual "battle of the experts" which the jury will have to consider and resolve. If Dr. Hendrickson's opinions had solely been based upon, and conditioned upon, the absence of the possibility of fretting at the fracture site, Defendant's motion would arguably have merit. But that's not the state of the record before the Court. A material dispute of fact exists.

Defendant next argues that having acquired the ability to make Dr. Hendrickson feel awkward at trial translates into Dr. Hendrickson not being a competent or qualified expert witness. Dr. Hendrickson has rendered scientifically supportable opinions based upon the fracture site as he examined it. The fact that he was mistaken about whether it was a modular or traditional prosthesis has nothing to do with his examination of the fracture site itself nor his opinions. The fracture site, when examined macroscopically as well as microscopically, would have appeared to him exactly the same whether the prosthesis was of a modular or traditional style.

For the defendant to suggest Dr. Hendrickson is somehow not even a qualified or competent expert witness is incredulous. As Dr. Hendrickson's Affidavit indicates, he has testified in trials as a metallurgical expert for both Plaintiffs and Defendants for decades. He has testified in dozens of states and federal courts throughout the country. Never once has a judge ruled that he was not qualified to render opinions

within his area of expertise.  Being mistaken as to the structural style of the failed prosthesis is a disconnect to stating that he is not an expert witness as to metallurgical failures.

Defendant argues that Dr. Hendrickson does not have knowledge as to how Wright Medical actually manufactured the prosthesis in question or how the prosthesis left Wright Medical in a defective condition.  Defendant then argues that, "Dr. Hendrickson concluded without any evidence that some unknown manufacturing defect must have occurred".  Defendant cites the *Diviero* case where the plaintiff's expert on tire separation was excluded as an expert witness.  However, that expert witness could only testify that the product was defective simply "because it failed", without offering more.

Defendant's position misstates the record and Dr. Hendrickson's opinions as to the cause of the fatigue fracture.   Dr. Hendrickson has not opined that the prosthesis in question was manufactured defectively just "because it fractured".  In his reports, deposition and affidavits, he has described the basis and nature of how the fracture occurred, why it occurred, and how the defective nature of the prosthesis stem resulted in eventual fracture.  Quoting excerpts from his initial report, Dr. Hendrickson stated as follows:

> "My visual examination indicated to me that the fracture face of the hip prosthesis had all of the macroscopic features characteristic of a fatigue fracture.   In that regard, parallel curved lines called 'beach marks' are obvious on the fracture surface.  A fracture process such as occurred with respect to this prosthesis requires two phases.  The first phase is the crack initiation phase. The second phase is the crack propagation phase.  Once a crack initiates, the crack tip acts as a stress concentrator and the crack then advances, or propagates, slowly by moving a small distance each stress cycle, depending upon the magnitude of the applied stress.  As the crack propagates, it effectively cuts through the cross-section of the component, in this case the stem, reducing the load carrying area, thereby increasing the stress magnitude each cycle of stress.  This causes an increase in the crack propagation rate with increasing time.  When a large enough area is cracked by fatigue such that the cyclical stress reaches the ultimate tensile strength of the metal, an instantaneous and final fracture occurs.
>
> . . . .

-4-

My analysis using scanning electron microscopy, or SEM, revealed the presence of surface cracks at the area identified as the origin of the fracture. Surface cracks such as those I discovered near the fatigue crack initiation site are known to cause fatigue fracture that would otherwise not occur. These cracks act as stress concentrations and crack initiation sites. **The first phase of the fracture process was therefore effectively manufactured into the stem**.

In conclusion, my opinion is that the defect of the prosthesis was a manufacturing defect in the form of microcracks on the outer surface of the stem about 34 mm below the proximal end. These microcracks caused the initiation of a fatigue crack which, in turn, propagated through approximately 90% or more of the cross section of the stem when exposed to the cyclic stress associated with Mr. Pearson's normal human ambulatory motion. The physical appearance of the macroscopic fracture surface is positive evidence that the fracture of the subject stem was caused by a manufacturing defect, specifically metal fatigue." (Hendrickson Affidavit, paragraphs 7, 11 and 12 – See Defendant's Statement of Facts, Exhibit I, emphasis added.)

Defendant conveniently ignores another fact in the record, namely, that Defendant's risk manager has acknowledged Defendant's fault and liability in her conversations with John Pearson. While those discussions between Mr. Pearson and Debbie Dauer, Defendant's risk manager, **later** went on to have settlement overtones, Ms. Dauer admitted liability and fault to Mr. Pearson **before** she invited Mr. Pearson to present a settlement demand to Wright Medical. While those subsequent settlement discussions would be inadmissible pursuant to Rule of Evidence 408, Ms. Dauer's initial acknowledgment of liability and fault is clearly an admission by a party opponent and can be presented to the jury. Although not necessary to defeat the present motion, Defendant's admission of liability by its risk manager precludes summary judgment in Defendant's favor for yet another reason.

DATED this 30th day of April, 2010.

        STEPHEN C. RYAN, P.C.


        By /s/ Stephen C. Ryan
        42104 N. Venture Ct., C-114
        Anthem, Arizona 85086
        *Attorney for Plaintiffs*

-5-

COPY of the foregoing
delivered/mailed
this 30th day of April, 2010 to:

The Honorable Frederick J. Martone,
District Court Judge

Donald L. Myles, Jr., Esq.
Donn Christopher Alexander, Esq.
Jones, Skelton & Hochuli
2901 N. Central, Suite 800
Phoenix, Arizona 85012-2703
-and-
Michael V. Kell, Esq.
Howard and Howard Attorneys, PLLC
450 West Fourth Street
Royal Oak, MI 48067
Attorneys for Defendant Wright

By /s/ Cindy Rock