STEPHEN C. RYAN, ID # 4255
**STEPHEN C. RYAN, P.C.**
42014 N. Venture Dr., C-114
Anthem, Arizona 85086
steveryan@azis.com
(623) 551-3813
*Attorney for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JOHN PEARSON and STEPHANIE LEE, husband and wife,<br><br>            Plaintiffs,<br><br>vs.<br><br>WRIGHT MEDICAL TECHNOLOGY, INC., a foreign corporation,<br><br>            Defendant. | CV 09-485-PHX-FJM<br><br>PLAINTIFFS' RESPONSE TO DEFENDANT WRIGHT MEDICAL TECHNOLOGY, INC.'S STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT; PLAINTIFFS PEARSONS' SUPPLEMENTAL STATEMENT OF FACTS |

Responding to Defendant's Statement of Facts, Plaintiffs admit, deny and allege as follows:

1. Admit.
2. Admit.
3. Admit.
4. Admit.
5. Admit.
6. Admit.
7. Admit.
8. Admit.
9. Admit, though Dr. Hendrickson's opinions would not, and have not, changed based upon whether the implant was a single piece device or a modular device.

1  10. Admit that Dr. Hendrickson relied upon the lack of the possibility of fretting but only to rebut the opinion of Defendant's expert that fretting caused the implant to fracture. Dr. Hendrickson's opinions as to the cause of the implant fracturing were independent of, and unrelated to, fretting.

5  11. Admit that Dr. Hendrickson relied upon the lack of the possibility of fretting but only to rebut the opinion of Defendant's expert that fretting caused the implant to fracture. Dr. Hendrickson's opinions as to the cause of the implant fracturing were independent of, and unrelated to, fretting.

9  12. Admit that Dr. Hendrickson relied upon the lack of the possibility of fretting but only to rebut the opinion of Defendant's expert that fretting caused the implant to fracture. Dr. Hendrickson's opinions as to the cause of the implant fracturing were independent of, and unrelated to, fretting. (See Hendrickson Affidavit, Exhibit 1.)

13. Admit.

14. Admit.

15. Admit.

16. Admit.

17. Admit Dr. Hendrickson so testified but, again, his opinions as to the cause of the fracture are independent of, and unrelated to, fretting.

18. Admit Dr. Hendrickson so testified but, again, his opinions as to the cause of the fracture are independent of, and unrelated to, fretting.

19. Admit.

20. Admit.

21. Admit this is Dr. Ochoa's contention and opinion.

22. Admit this is Dr. Ochoa's contention and opinion.

23. Admit.

24. Admit but deny as irrelevant and immaterial. Dr. Hendrickson does not have to understand Wright Medical's manufacturing process to scientifically examine,

1 and opine upon, the cause of this metallurgical fracture.

2     25. Deny as irrelevant and immaterial whether Dr. Hendrickson reviewed any of Defendant's "manufacturing records, processing records, or design history" records. Nor do the deposition excerpts quoted by Defendant support Defendant's factual statement. As to Defendant's statement that Dr. Hendrickson "knows nothing about the condition of the implant when it left Defendant's control", that is contradicted by Dr. Hendrickson's testimony and his Affidavit. (Plaintiffs' SOF, Exhibit #1.) Dr. Hendrickson has testified that the prosthesis would have left Defendant's control containing numerous microcracks on the outer surface of the stem of the prosthesis.

    26. Admit but deny as irrelevant and immaterial. Dr. Hendrickson does not need to know about the "surgical technique" of Mr. Pearson's orthopedic surgeons or the content of Mr. Pearson's actual medical records to opine as to the metallurgical cause of the implant's failure.

### **PLAINTIFFS' SUPPLEMENTAL STATEMENT OF FACTS**

1. As Dr. Hendrickson's attached Affidavit indicates, his opinion that the prosthesis failed due to a premature fatigue crack resulting from a manufacturing defect has nothing to do with whether the prosthesis was a one-piece structure or a modular structure. (See attached Affidavit of Lester Hendrickson, Exhibit 1.)

2. Dr. Hendrickson's deposition testimony makes it clear that even if he had understood that the prosthesis was a modular implant which would allow metal to metal contact to occur, his opinions as to the cause of the implant's fracture were based upon other findings with respect to his examination, not related to the possibility of whether fretting could have occurred:

> "Q. Do you wish you had known before you formed your opinions in this matter that it was a Profemur Z?
>
> A. No.
>
> Q. With a short neck?

-3-

1  A. No.

2  I mean, it would have – it may have been – it may have had an influence on – if in fact you're correct about this metal-on-metal contact, it could have had an influence there on my decision, on my opinion, but it would not have made any difference in the conclusions I reached about the type of failure this was or what caused it. Those opinions were based purely on physical evidence.

Q. Is there anything that could change your mind in this case, Professor?

A. My mind about what? About what?

Q. – Hendrickson.

A. No, nothing will change my –

Q. – initiating the fracture versus a fretting phenomena?

A. No, nothing will change my – I don't see anything at this point that would change my opinion that this was caused by a manufacturing defect and that it was a fatigue fracture.

It does appear that this information that you've represented in Exhibit 6, if it is correct, there may have been metal-to-metal contact at the origin.

Still don't see any evidence of fretting."

(Hendrickson 01/27/2010 deposition excerpts, page 136, line 4 to page 137, line 7, attached as Exhibit 2.)

3. Dr. Hendrickson testified at his deposition that irrespective of whether there had been metal-to-metal contact at or near the site of the fatigue fracture, the physical evidence he saw excluded fretting as the cause of the failure:

"Q. Why are the surface fissures you observe in photographs 11 through 14, inconsistent with fretting damage?

A. There are three reasons.

Q. Okay.

A. One of the reasons is that the pattern that you see in the wear markings on a surface, which has been disturbed somewhat, is non-linear. It goes into a variety of different directions.

Number two, there's no debris in the fissures, even though they are very fine, very deep, very tight fissures.

-4-

> Number three, there isn't a bit of – shred of evidence of any pitting in the area where the fissures are located. The pitting is one of the unique characteristics of fretting.
>
> And finally fourth – I guess there is a fourth reason – is that there is no physical contact between the location of this – these fissures and any other metal component in the whole system."

(Hendrickson January 27, 2010 deposition, page 96, lines 3 through 22, attached as Exhibit 2.)

4. The operative report prepared by Dr. Firestone states that to remove the remainder of the fractured neck from the femoral stem of the prosthesis, Dr. Firestone spent two hours, and went through twelve separate metal drill bits, just to remove the remainder of the modular neck from the stem. Dr. Firestone even referred to the fractured neck as being "soldered" in place. (See Exhibit E to Defendant's Statement of Facts.)

5. As Dr. Hendrickson's attached Affidavit indicates, the need to spend two hours and twelve drill bits to remove the remaining portion of the fractured neck makes it clear that the repetitive motion between two metal surfaces, which all experts in this case agree needs to be present before fretting can even be a possibility, could not have been occurring.   (Hendrickson Affidavit, Ex. 1.)

6. As Dr. Hendrickson's Affidavit indicates, he bases his opinions as to the prosthesis being defectively manufactured by his observations of the actual area of the fatigue fracture, an analysis that is independent of whether the prosthesis was a modular prosthesis or whether the neck and stem were one piece. The validity of his opinions did not depend, and still do not depend, on whether the prosthesis was modular or a single component. (Hendrickson Affidavit, Exhibit 1.)

7. Wright Medical has admitted liability for Mr. Pearson's fractured prosthesis. Plaintiff John Pearson so testified at his deposition:

> "Q. Have you spoken with anyone from Wright Medical about the failure of the hip prosthesis?
>
> A. Have I ever?

-5-

1  Q. Correct.

2  A. Yes, I have.

3  Q. Let's talk about that for a moment. When's the first time you talked to someone from Wright?

4  A. July '08.

5         . . .

6  Q. Who did you speak with?

7  A. Debbie Dauer.

8  Q. What's your understanding of Ms. Dauer's position at Wright?

9  A. She is a risk manager with risk management. Thank you.

10         . . . .

11

12 Q. Did Ms. Dauer ever tell you what she thought caused the prosthesis to fail?

13 A. She had said several times that they were responsible for it, that it was their fault.

14 (Deposition of John Pearson excerpts, 02/18/2010, page 88, line 7 to page 89, line 1; page 90, lines 6 to 9, attached as Exhibit 3.)

15

16    8. Attached as Exhibit 4 is John Pearson's Affidavit in which he states that

17 Defendant Wright Medical's Risk Manager, Debbie Dauer, admitted to Mr. Pearson, in

18 their initial phone conversation, that Wright was "at fault" for the fractured prosthesis

19 and that Defendant wanted to "make it right" with Mr. Pearson for what he had

20 experienced. (See attached Exhibit 4.)

21    DATED this 30th day of April, 2010.

22                    STEPHEN C. RYAN, P.C.

23

24                    By /s/ Stephen C. Ryan
                      42104 N. Venture Ct., C-114
25                    Anthem, Arizona 85086
                      *Attorney for Plaintiffs*

26 . . . .

27

28                    -6-

1  COPY of the foregoing
   delivered/mailed
2  this 30th day of April, 2010 to:

3  The Honorable Frederick J. Martone,
   District Court Judge
4
5  Donald L. Myles, Jr., Esq.
   Donn Christopher Alexander, Esq.
6  Jones, Skelton & Hochuli
   2901 N. Central, Suite 800
7  Phoenix, Arizona 85012-2703
   -and-
8  Michael V. Kell, Esq.
   Howard and Howard Attorneys, PLLC
9  450 West Fourth Street
   Royal Oak, MI 48067
10 Attorneys for Defendant Wright

11 By /s/ Cindy Rock